First case I want to welcome Judge Arenas, who is a very distinguished judge from the District Court of New Jersey, who has kindly consented to sit with us today and tomorrow. We thank you for your time and expertise. I know we're going to benefit from your presence and your intellect. The first case is U.S. Steel Workers v. Rohm&Haas. May it please the Court. My name is Raymond Kresge and I represent the appellant Rohm&Haas company in this appeal. I request that five minutes of my argument time be reserved for rebuttal. This is an important appeal on the subject of arbitrability of the denial of Rohm&Haas beyond the benefit claims of the four agreements in this case, but also a far broader impact for how ERISA benefit claims are to be processed in the United States. Let me ask you a question. I probably shouldn't direct this to Mr. Payne, and I will, but if the District Court is right here, what happens to the language in the plan about the powers of the administrator of the plan? Well, that's precisely one of our primary arguments, Your Honor, that if the District Court is right that the plan was incorporated into the collective bargaining agreement, the District Court needed to go to the next step of its inquiry and then hope that because the plan's claims procedures, which are part of the plan, are incorporated into the collective bargaining agreement, then those claim procedures control over arbitration for processes of the benefit disputes. And what language did you rely upon to find that it was incorporated into the CBA? I do not have any. There's no language that I can tell that the District Court relied upon. In fact, what the District Court did is hold that the collective bargaining agreement was ambiguous, but the District Court judge never explained why he reached that holding,  I thought he did explain why. It was general. I mean, we're talking about, what, is it Article 5 and Article 6 that talk about arbitration? Yes, Your Honor. Article 6 is the arbitration clause, and the arbitration clause... But Article 5, looks like 5A, talks about should an agreement not be reached, the grievance may be referred to the mediation and conciliation service for mediation, but should the grievance involve interpretation of the contract, then either party may submit the matter to arbitration as described in Article 6. So, what he's saying is, if you have a general and broad and ambiguous provision, then there is a presumption of arbitrability. If you specifically exclude something, or you say only include it as X, Y, and Z, and that doesn't include A or B, then you have an argument. So it seems as if, in light of our case law, there's a presumption for arbitrability. I mean, let's face it, what's happened the last, almost now 25 years since Moses Cone came out, is there is a sea change in terms of, let's favor arbitration at every turn. I can't think of a single case, maybe fault, that really goes against that. Your Honor, first of all, I think that there have been a number of cases from this Court which have held that the presumption of arbitrability does not always apply. It can be butted, but the presumption is there if there's an arbitration clause. Well, Your Honor, you're saying if it's a narrow arbitration clause, there's a presumption. In fact, as the Verizon case directs us, as Crabrock directs us, this Court has made it very clear that the presumption of arbitrability, which we have from AT&T in the Steelworkers Trilogy, only applies, as we look at the AT&T language, to broad arbitration clauses. And this is pretty broad, isn't it? I would respectfully say, Your Honor, that it is not. It is limited to simply an interpretation of the meaning of an article of the contract. But that's exactly what 5A says. But should the grievance involve interpretation of the contract, then either party may submit the matter to arbitration. As described in Article 6. Article 6 tells you how to go about it, right? Well, I would say that Article 6 basically tells you the scope of arbitration, because it says in it that you are limited to interpretation of the meaning of an article of the contract, number one. And number two, that the arbitrator cannot modify, subtract from, you know, add to in terms of the party agreement. And this Court has looked at similar clauses, particularly with that latter language, and has held them to be narrow. Now, Judge Joyner, on page 12 of his opinion, seems to have been, at least as an aside, on at least one prior occasion, the company has agreed that the issue of whether the company violated the disability income program when it refused to pay an employee disability retirement benefits, which is what we have here, was properly arbitrated. And they have plans to exhibit you. What was that all about? That should not have been considered, Your Honor, in this case. It had nothing to do with the parties in this case. It's a different Roman house entity. Absolutely, it has nothing to do with the parties. But what he's saying is, once upon a time, in a similar type situation with respect to disability benefits, you went to arbitration. Do you know why? No, Your Honor, I do not. I was not involved. I did not represent the company. I do not know what the collective bargaining agreement terms were. I do not know anything about the context of that case. And as we know, arbitration is a creature of contract. So I do not know... But to what extent is bargaining history relevant in interpreting the contract or trying to get the intent of the parties? It is not relevant if, indeed, the terms of the arbitration clause are clear and unambiguous. And in fact, as this court directed in the Verizon case, you should not look at extrinsic evidence if the arbitration clause is clear and unambiguous. Counsel, what do you make of 19-3, section 19 of the CBA? Especially the last sentence of 19-3. 19-3, we respectfully submit, is not relevant to this inquiry. The union simply attempts to look at 19-3 because there's a passing reference to a sickness and accident plan benefit that is to be preserved during dependency of what I refer to as dueling doctor examinations in terms of whether or not somebody is physically capable of working. Can you step back for a minute? What was 19-3 designed to cover? Why is it in the contract? What's it there for? If we look at the title of Article 19, it's entitled medical examinations. And what the purpose of Article 19 is designed to do is to simply address, and particularly subsection 3, what happens when there is competing medical views as to an employee's physical capacity to work. And all it does is it simply preserves Let me ask it another way. Is it 19, generally, designed to protect an employee from a boss who says, you're too disabled, you can't work here, I'm either firing, I'm either terminating you, and the employee says, I want to work. Isn't it the reverse of the normal disability situation? In other words, the employee is saying, I want to work. The employer is saying, you can't work because you're too sick to work. And then you have a provision that basically says, okay, the employee has a right to get his own doctor and to challenge him. By the way, if you're going to move him out, try to remove him from his job. It's like an early version of ADA protection, a very early version of that. It talks about what job, but later on, you can do what job you're capable of doing. It sounds almost like a combination. I'm just curious what your take, what that section is really designed to do. Forget the reference to this phantom accident or sickness and accident. What was that paragraph designed to do? What were they bargaining about there? I think what they're simply bargaining about is the title of the article states medical examinations and what happens, how medical examinations are to be used. That's not how they're used in a benefit plan. Correct. You don't talk about the right of an employee to have an exam. A benefit plan says obligation to do that. Correct. This really is simply dealing with medical examinations in the unionized environment for this particular bargaining unit. Under what circumstances do we conduct medical examinations? And then when we're evaluating a physical inability to work. But a physical exam for what purpose? For physical ability to work, physical capacity. But in what context? In the context for an application for a disability under a plan? No. Or for? A return to work. A return to work? Right, all right. I can't throw it any softer than that. I'm so sure. I mean, clearly our position is it has nothing to do with a disability plan with regard to disability benefits. It has nothing to do with medical examinations that may be required under the disability benefit plan. And it is outside of that. And the only reference to the plan, to the extent it is a reference and it's unclear because it just makes reference to accident sickness benefits, is to the preservation of that benefit during the pendency of the dueling doctor examination. But it has nothing to do with the disability benefit. Let me lay it out a different way. There's an argument that you might have that where you, the only time you talk about disability benefits is in this one narrow situation. The flip to that is that your opponent would say you extrapolate from that and you would argue that any time you're talking about disability and benefits, one way or the other, the goal shall be to have such situations resolved as soon as possible, which is the last sentence of 19-3. But wouldn't you have an argument that 19 is a narrow provision? It is a narrow provision that has absolutely no connection. I think this is the most important, probably the most important part of this case, which is that the union, in order to establish arbitrability, has to look into some article of the contract. Because again, an arbitrator, the parties only... Which contract, the collective bargaining agreement or the plan? The collective bargaining agreement. And under Article 6, an arbitrator can only interpret the meaning of an article of the contract. And the union has never said that Article 19 is a subject of the disputes that it's seeking to arbitrate. In fact, the union has never attempted to identify an article of the contract that would be interpreted by an arbitrator. But I guess Article 19-3 does make explicit reference to the plan, does it not? It is an open question, Your Honor, because... Well, it says it. Look at what it says. It's a division of the sickness and accident plan. It's called accident sickness, though. It's a little... It's close, it's close. I don't know why it's close enough. It is close, Your Honor. Your Honor, I would only note that the union president in the 30B6 deposition could not identify whether or not the reference in Article 19 to the accident and sickness plan was indeed a reference to the benefits that are at issue here, which are essentially described in the 1994 Assembly Plan description. Just one question. Let's assume 19 specifically said claims under the 2003 benefit plan, well, of course it wasn't in existence then, but its predecessor, was arbitrable. It said that specifically. Would you then agree there's no case here and that Judge Joyner is right? If the agreement actually said that's arbitrable... Then what is arbitrable? Any claim under the benefit plan, any claim for benefits under whatever the predecessor to the 2003 plan was, because this was done in 2000, so presumably there was some predecessor to the 2003 plan was in effect at that time. And it said specifically any claim under that plan is arbitrable. It said it there or someplace else. Do you agree? Is it your position then that you'd have no case and you'd agree anybody who had a plan, anybody who had a grievance under the... was denied a long-term disability could arbitrate it under the CBA? Yes, if the collective bar agreement specifically provided that claims under the disability plan were arbitrable, then the parties had contractually agreed to submit those disputes to arbitration. You may be giving away too much because there's still a problem with the language of the plan, giving the plan administrator the final and ultimate say for any benefits under that plan. So you'd have two contracts that directly butted heads and you'd have, I guess, dueling presumptions. One, the presumption of arbitration in the collective bar agreement versus the presumption in the definition of the plan administrator. Well, I think that's an important argument that we have made that the union hasn't even addressed in its appellate brief, which is, in our case, we don't have the language that Your Honor has mentioned, which is that claims under the plan are arbitrable. And since we do not have that language, and even if the district court is correct somehow that the plan was actually incorporated into the collective bargaining agreement... No, no, not that it was incorporated, just that it said it was arbitrable. Incorporation gets kind of a hairy concept. Just assume it says, anytime anybody's denied a benefit under the benefit plan, that dispute is arbitrable. Just said that. It would create a different case than what we have. I think, as Your Honor properly pointed out, we would then have dueling decisions in terms of whether or not we defer to the plan administrator Each claiming exclusivity, by the way. The benefit plan has a claim of exclusivity in it on procedure. Right. And you would throw out about a hundred years, not a hundred years, about twenty years of circuit and Supreme Court precedent on the standard of review of decisions of the administrator, of which the Third Circuit has many such decisions. If it says that part of the union is good and so on, then you have a drafted agreement. And that is indeed an important policy that we have to address here, which is the policy of ERISA. It's not just what we have here. What the union is arguing is focusing on traditional labor policies and the expertise of arbitrators in terms of the law of the shop and the like. Those kinds of policies under federal labor law that traditionally favor arbitration are not really present here. Rather than more important policies that we have. But this is a case under the LMRA, right? This is a case that has been brought to compel arbitration, yes. But those kinds of policies, Your Honor, are not present here. Rather, the more important policies are the policies that underlie ERISA, the need for uniformity, the deference to the plan administrator, the development of well-developed standards of review for evaluating how ERISA claims have been decided. At this stage, this is a preliminary area. I mean, how are you going to resolve the dispute? We're going to resolve the dispute the way, indeed, the four employees did it, which is that they went through the plan procedures. They filed claims. They had those claims evaluated by the plan administrator. They disagreed with the decisions that had been reached by the plan administrator, which was to deny the benefits. And keep in mind, they were asking for enhanced benefits for the most part. They already have their LTD. And now they have, as part of count two of the case, filed Section 502A1B claim to ERISA. And that's, indeed, how the claims... In which they're dead in the water. That's what this case is about. They're dead in the water on such a case because of the presumptions, because of the deference given to an administrator's decision, which is nationwide law everywhere. As we know from different decisions, such as Post and others, it's not necessarily dead in the water. Well, if there was a private carrier or something like that, but not in this situation. This doesn't fall under Judge Becker's limited exception to that. This is your classic deference given to the administrator. That's what this case is. That's why this is such an important case to the union. If they can get arbitration for all of those benefit claims, you wipe out literally dozens and dozens of circuit cases around the country, maybe Supreme Court as well, that create a very limited review of an arbitrator's decision. I mean arbitrator and administrator's decision. And then favor an arbitrator who's unreviewable. Arbitrator says, no, you can recover. It's not reviewable. Do you have time for your boss later? May it please the Court. My name is William Payne, and I represent the appellees, who is the United Steelworkers of America and the four individuals. Mr. Payne, if you're right, help me with this. If you're right, what does this situation look like? You've got a situation where you've got a plan agreement that reserves the plan administrator the final say about benefits under the plan. And you've got a collective bargaining agreement with an arbitration clause. So let's assume the good arbitration. You arbitrate a grievance arising out of the plan administrator's denial of benefits. So you have a situation where the arbitrator says you're entitled to benefits.  And in terms of your plan, you have to defer it to the sense you're not entitled to benefits. So they get benefits because of the arbitrator whose power arises out of a collective bargaining agreement that doesn't incorporate the plan. Is that the picture you're looking at? Because that's an ugly picture. No, Your Honor, I don't think it's inconsistent to have the company and its designated administrator, which is obviously one of its employees, make a ruling which then goes through arbitration. I don't think the two procedures are mutually exclusive. Even when the plan says that that ruling is final? It doesn't exclude arbitration. Help me with this. What does final mean? Well, it's final, which is always what a company decision on denying disability is. And then in the union setting, you have that final decision by the employer. And then you go through the grievance procedure and you have a truly neutral person decide whether the people are entitled to benefits. So it's final until it's changed by somebody whose power arises from a document other than the benefits plan? Yes. I don't think it's inconsistent. It doesn't say we're excluding arbitration, the possibility of arbitration. Maybe the whole thing here comes down to burden. Why does it have to say that? Is there anything... Let me back up a second. What's the best case? Forget best case. What is a case that supports your position? And then we'll go from best case after you give me a case that supports your position. The fact of the matter is that we have the strongest possible policy in favor of arbitration in this country. And that the clauses here... So arbitration is a creature of what? It's a creature of contract and here... Where in the contract does it reference the plan that you're trying to get benefits under? And this is different from the initial question, to give me a case that supports your position. I guess you're talking about AT&T and the general policy in favor of arbitration. You have the general policy and then you have the clauses themselves that say where... This is Article 5, which was really ignored all the way through their brief practically and they got into it a little bit in the reply brief. But they're very broad clauses. They're indistinguishable from AT&T. Read the broad clause to me. It says that where grievances, quote, involve interpretation of the contract, then either party may submit... Involve interpretation of what? The contract, small c. That's one clause. That's on page 303. So what you're then saying is that the contract, you would look back to what? Article 2, Section 5, and somehow you're saying that working conditions is... Right. Then the next clause, there are two clauses in there. The next clause says any such questions arising under this agreement as involve working conditions, which any employee may desire to discuss with the company, shall be subject to adjustment under the grievance procedure. Those two things, one references contract, small c. The other says anything involving this agreement. And even this Article 6, Your Honor, has all the articles of the contract. It's not limiting grievances to any specific provisions like the Verizon case and like... But it's limiting them to... To the contract. The articles of this contract. Whether it's uppercase C or a small c, it doesn't matter. It's this contract. Well, in the labor context, Your Honor, I mean, going back 50 years, a contract is not considered to be like an asset purchase agreement where you have an integration clause and everything is very particular. Rather, it is the law of the shop. It's a lot more flexible concept. And, you know, we see... What makes you think the plan is part of this contract? What do I mean? That's the issue. What makes you think the plan is part of this contract without any language to incorporate it or even refer over to it? Well, number one is the bargaining history. All of these benefits were negotiated back to 1966. Every single year, there's a settlement agreement. And it shows from 66 all the way through 98 that this particular benefit was negotiated. It went from 50 percent to 75 percent. Didn't we say in Verizon, didn't Judge Selva say that where the contract is clear and unambiguous, bargaining history is used to turn it in opposite? But we don't get to that extrinsic evidence, do we? Well, I think it's trying to determine what this contract small c is, whether this is a contract benefit. And then you have Article 19 that you were discussing. It doesn't specifically incorporate the whole disability income plan. I mean, you don't have words like that. You don't need that in the labor context. But it does acknowledge that the sickness and accident program, again, exists. And the sickness and accident program was under testimony. Mr. Ryan of the company testified that that is referring to this whole package of benefits. And by the way, sickness— Counsel, can you slow for a minute? Yeah. Assume there was no Article 19. Yeah. But Article 19 just wasn't there. That's my two questions. My first question, assume it wasn't there. Right. The contract otherwise is identical, but there's no Article 19. It just never crept in there. Well, I would say we still win. So you're not really depending on 19. Your argument is that this is a working condition that somehow or other that drags in. Yes, you are. Secondly, what is Article 19 designed to deal with? What were they bargaining about in 19? What were the two sides bargaining about when 19 got created? Were they bargaining about benefit plans there? Well, they are because it says what to do with this person when the examination comes up. Did you read the syntax and the context of that section? That's not really about benefit plans at all. That's about an employer who's trying to dispossess an employee of his job on the theory that he has a bad physical condition. And this is to protect the employee. This is for the employee who wants to work, not for the employee who's trying to get out of work by getting on disability. But I think that because it's in the labor contract, it acknowledges that this package of disability benefits exists. And when you look back, it was actually bargaining. That's not an issue. We know it exists. It exists because of collective bargaining.  ERISA allows them to change it. In Third Circuit law, you can't change a pension plan, but a benefit package you change all the time. I disagree with that, Your Honor. They can't unilaterally change it. They did change it. There actually is a grievance there that as of this litigation was unresolved that protested what they did. But they did change it. They adopted in 2003 a plan. And they didn't collectively bargain it. They changed it. The union has a problem with them changing it. And there was a grievance out there which appears at A-174 which protested them changing it in 2003. In fact, I think there are things in that plan. Maybe the union was a little sloppy in letting the company get away with it in putting stuff in there that wasn't collectively bargained. So I've been careful to say that not the whole thing is incorporated. But if you look back over the history from 1966, every substantive benefit in there was negotiated. In Prong 3, that's when we get to, when we're going through arbitration clauses, it's the third prong that we get to bargaining history. And that is whether or not there's anything else that they can forcefully rebut the presumption of arbitration. So let's assume that bargaining history comes in. I was still trying to figure out what your view of these documents looks like. And it sounds like we have an ERISA plan, again, giving the authority to interpret that plan to the plan administrator, where the plan administrator's interpretation of that plan is subsumed to the arbitrator's interpretation of the plan. So the arbitrator is really the ultimate interpreter of an ERISA plan, giving that authority to the plan administrator. That's what we end up with, if you're right. Well, it doesn't. There's nothing wrong with that. I guess it doesn't. I think it's silent on whether the arbitration procedure or the labor agreement also enters into it. I'm not trying to understand what you mean. If you're right, it has to be that the decision of the arbiter on benefits, like disability benefits, controls the denial of a plan administrator who's given the authority by the plan to interpret that disability plan. That has to be it. That's what you're arguing. Yes, that's exactly right. Is there any case out there that you know of, any case, through our circuit, one of the lesser circuits, Supreme Court? Even lesser court. Anyone that supports what you're arguing, that you can have a situation where the arbitrator's decision controls the decision of a plan administrator, whether the plan that the administrator is administering gets the plan administrator the ultimate authority to interpret it. Is there any case out there that says that? Maybe we didn't do as good a job researching as we could, but I know from my personal experience, it happens all the time. Well, it might happen. A lot of stuff goes on. That's why we have courts. So a lot of stuff goes on all the time. Maybe it should go on. Yeah. For some authority. The employer and this plan administrator concept, it's really the same thing as the employer denying the benefit before you had a risk. Then you have a risk that slowly employers... Well, again, it's different if the plan does not set the administrator up to be the ultimate, I won't use the term arbiter, ultimate adjudicator of the provisions of the plan. That's a different scenario. And even then, it's a bit messy. But I could see there, arguably, you could have a dual system of arbitration and an ERISA plan. Counsel, I want to pick up on what you're saying about collective bargaining. Let's assume the 2003 plan and all its predecessors were collectively bargained. They actually sat down, they met, they worked out every little paragraph. That would also mean, then, that the procedure in the plan, the administrator's authority in the plan, and all those provisions about how you go about presenting a claim were collectively bargained. If your position is right, that this is an agreement we should look at as one that's collectively bargained. That includes the whole agreement, then. It includes all these things that you're now disavowing. What I said was that all substantive provisions were negotiated. The union has some problems with some of the things in there. However, I will go back to my point. I think if you look at that claims procedure under the SPD, it doesn't exclude arbitration. It says this person is going to make this decision. And it's final. Yes, but that's final before what? It seems to me that it has to be more specific than that, particularly when you apply the presumption of arbitrability. More specific than final? Yes. It has to say the arbitration procedure of the labor contract is not applicable. The company could have bargained for that. It came as quite a shock. They did bargain for that by having the arbitration clause, which is limited to these kinds of things, including working conditions. What's your best argument? Working conditions, anything in the contract, anything in the small C contract, anything in the large C contract. What makes you think that disability benefits are working conditions? I would think that working conditions were the conditions in which you work. Overtime, hours, safety. I saw that in the company's reply brief, that the disability income program or a sickness and accident program shouldn't be considered a working condition. And I guess I disagree wholeheartedly because it came in the reply brief. We couldn't get into that. Now, what we tried to do in our opening brief. What's the evidence that you have that working conditions. I have cases on that, Your Honor. Incorporating disability. What we cited, what we tried to do at footnote on page 17 is we refer to under the National Labor Relations Act, there's a generic category of working conditions. We have the wrong site there. We cite 29 U.S.C. 152. Probably should have said 159A. That refers to this broad category of working conditions that are a mandatory subject for bargaining. But you're putting the rabbit in the hat. You're saying that because under 29 U.S.C. section 152, disability income benefits are considered mandatory subjects for bargaining. They therefore must be working conditions. No, because working conditions, if you look at 29 U.S.C. 159A, which is, I said 152 there, which actually also refers to labor disputes and it refers to working conditions. But 159A would have been the proper site. And it says. What does 159A say? It says that there is a category of items, wages, working conditions that are a mandatory subject of bargaining. But where does it say. Disability benefits equal or are included within working conditions. There are many cases that have interpreted the word working conditions to include. Do you cite those cases in your brief? No. We should have cited it in the footnote. But I'll just keep saying that. But somewhere, that's fairly important. Yeah. Yeah. But that is just standard law that you have cases like WW Cross versus NLRB, for example. These cases go back to, they're all 1949 cases. That's one of the very first things they interpreted. Could you submit to us just a short letter that says any case that says that disability benefits are subsumed within working conditions.  I'll do that, Your Honor. I apologize. The other side obviously can submit at the same time. Is there a possibility that you could do that within the next week? Yes. We'll do that right away. By Tuesday of next week. Before you sit down, counsel, just one more question. I have some more questions, too. I hate to go back to 19 again. But if an employer says to an employee, you're too sick to hold this job, I'm transferring you to a lower paying job. Or I'm fine. Maybe arguably in that context it's working conditions. Okay. Because you're. It's a demotion or a transfer. It's a demotion or a transfer or something like that. But again, that's why I go back to 19. It looks like what they're bargaining over in 19 is not some employee who says, I'm too sick to work and I want disability. It's rather the reverse. It's where the employer is saying, you're too sick to do this job. You're too sick to work. And the employee is saying, no, I'm not. I want my job. I want to work. And that's why you have him challenging, if you will. And they refer to the plant physician with his own physician. And they talk about a neutral physician. That arguably could be working conditions. That's why I keep focusing. I don't think 19, or at least it's arguable that paragraph 19 doesn't say really how do you get benefits or deal with getting benefits for somebody who wants to be disabled. But it's the flip side of that. Well, I come back to my same point, the fact that it's referred to that labor agreements are construed much more flexibly than other commercial contracts, that it should be considered. Do contracts ever say that included within this collective bargaining agreement are disability benefits or benefits? Yes. So they do it outside the context of working conditions? Well, I would consider them working conditions even if they were specifically referred to in the contract. But then you're telling me just, and again, the reason for why I'm asking you to submit something to us, because to a layperson, working conditions doesn't necessarily include disability benefits. It's the conditions in which you work, the physical conditions. Yeah, but I mean, what type of, even what type of retirement. Or actually, you could even expand that to things like overtime. Yeah, yeah, even with the type of retirement plan. What about your pension benefits? Would that be working conditions? Yeah, the type of retirement. Pension benefits are working conditions? Right, the type of retirement plan you're working under. I know it's covered by the section 9A that refers to wages and working conditions. It's not a working condition. Is there anything at all that is not under your interpretation of the term? No, I'm focused on things that are considered mandatory subjects of bargaining under section 9A of the National Labor Relations Act. And it's really quite expansive. But is there anything that's not included? Yeah, there's a lot of items that aren't included. All right, name one. Well, the things that are what is called non-mandatory subjects of bargaining, which is a right to strike a secondary employer, you know, there's... Why isn't that a condition of working? I mean, if the other is, I mean... It's the ultimate grievance resolution. Well, because you're not, the way that it's been interpreted, you're not permitted to bargain about that. Because you're done with policy. Right. So there's mandatory and there's non-mandatory. But I think that it's just read broadly, the provision, what working conditions of employment. But if it's read broadly, why wouldn't your brief not include that? Something that says that this is how this term of art is understood in this industry. I guess we were assuming that, I mean, that wasn't raised in the opening brief. And we were assuming it was pretty obvious that a disability benefit program is one of the conditions under which you work. And there was, you know, there's certainly no problem about that. It did come up in the reply brief. Let's just go back and just make sure we understand what the lay of the land is. If something under AT&T is broad and general, then there is a presumption of arbitrability. Definitely. If there is something, however, that gets more specific, such as, for example, Section 19, one might argue, okay, these things are included, other things are not included. No, Your Honor, that's not the way I read AT&T. I'm not saying that's how you do it. You don't have to agree with that. The point is that their argument is that there was some specificity here as to what could be included and what would not be included. Well, I think what they really have to establish, if they want to beat the presumption of arbitrability, is under the Verizon and TrackRock case that they have to have an arbitration clause that limits the right to arbitrate to specific categories. And that's what you find in Verizon. They listed five specific categories that you could arbitrate. The same thing with TrackRock. It was about a disciplinary issue, and there was a specific provision that said only these disciplinary issues, not others, are arbitrable. That's a far cry from something that says everything having to do with the contract is arbitrable. Discontract. Yes, Your Honor. And it's just nothing like the Verizon and the TrackRock cases. It's much more like... Well, even if you write about the rest of it, all that does is give you a pretty forceful, rebuttable presumption, and then your... Presumption. My colleague, Mr. Kresge, is going to argue that the operation here of the benefits plan and the language in the benefits plan and the plan administrator is sufficient to rebut the presumption, even forgetting bargaining. So you may be right that it's sufficiently broad that if you then have the plan going to Grady and Miguti, maybe we'll get to the bargaining history then. I guess you could get to it that way. But I still have a problem as to how these two plans would work. It seems like we would wreak havoc. And as Judge Arenas said before, you would overturn basically the labor law of the United States, if you're right. Well, instead of the court being the step, it does... You do, even when you go to the plan administrator, you go into court. And here you go to arbitrator first, and the court would be reviewable. You review the decision under the arbitration standards, as Mr. Arenas said. And you know how narrow that review is. Yes. Whether or not the submission is consistent with the scope of the agreement, and that's it. Right. It's a lot more efficient procedure, I have to say. I mean, they're trying to make a full-blown ERISA federal court lawsuit out of every person that claims to be disabled, when that's not what the union ever thought it was bargaining for. And that's not what ever happened. You never have one. We've got a couple more questions, and then we'll hear from your colleague. Article 6, paragraph 3 says, The sole responsibility of said arbitrator shall be to interpret the meaning of the articles of this contract, and in no way shall be construed that the arbitrator shall have the power to add to, subtract from, or modify in any way the terms of this agreement. What provision of this contract are you asking the arbitrator to interpret? Is that just a question of working conditions? Does this case, in your view, ultimately come down to the argument that working conditions include benefits? No. It's an expansive view of the word contract, small c, Your Honor, which is… This contract. Yes. You can't read the word this out of it. But, I mean, it's Article 19 refers to it. Please answer my question. The arbitrator shall be to interpret the meaning of the articles of this contract. Just tell me what article you want the arbitrator… Dear arbitrator, I protest what you've done violates Article… Article 19 does refer to… Article 19 doesn't… This is not a case of the employer trying to transfer somebody. You want him to interpret Article 19? Is that what you're asking him to do? Isn't your argument that the plan is included within working conditions under Article 19? That's the only thing you can have, but it certainly can't be 19. It is. But Article 19 is proof that it was considered part of the contract to the union. Perhaps inferentially, but it's a… The flip to that is that that's the only time that it's really brought in, because it's brought in specifically with respect to a claim that somebody is so incapacitated that he or she cannot work. Let me ask you one other question before you sit down. I don't understand pages 14 and 15 of your brief. Page 14, you say it appears under Lucan's seal that the district court's ruling must be affirmed unless its determination is clearly erroneous. Yes, Your Honor. Then on page 15, you say, well, what you've got here is a summary judgment, and therefore the standard of review, the last four of the last five words, six words of page 15, the standard of review is plenary. Your Honor, I have to confess that I think that Lucan's seal and John Harkin's, which come out very flatly and say it's a clearly erroneous standard of review, are hard to reconcile with Verizon. But Verizon doesn't say that it's overruling those cases. They could be overruling those cases. It's not an unmarked judgment. No, and it says, oh, because there was summary judgment here, we're doing a plenary review. But Lucan's and Harkin's are quite explicit and clear that they apply the clearly erroneous standard because they're trying to determine whether it's arbitral. But isn't this under the trilogy, under AT&T, under all the arbitration cases, isn't this an issue of contract, a federal contract law through the Federal Arbitration Act? If it's a matter of contract arbitration, why would it be anything other than the standard of review? We always apply to reviewing the district court's illegal rulings, and that is plenary. Well, because Lucan's says the opposite. It says quite clearly, even though both parties had a note and a footnote had said that it was plenary review, the court said, no, we're doing the clearly erroneous standard under Lucan's. Take another look at Lucan's, but maybe if we're reviewing the arbitrator's decision or the plan administrator's decision, that's a very different standard of review than if we're reviewing an interpretation of a collective bargaining agreement. That's exactly right, but I think under Lucan's and Harkin's, because they said we're reviewing the party's intent as to whether it's arbitrable, we apply the clearly erroneous standard. So we felt an obligation to, when they get to the standard review section, to point that out. There was no discussion of it in Verizon. They just said, because it's summary judgment, it's plenary review. Mr. Kresge, you deserve a few minutes. Don't feel obligated to take them. If you feel like you must say something in rebuttal, you deserve some time to do it. I'll be very brief. I never ever heard a lawyer begin rebuttal unless they first referenced it with, I'll be very brief. Sometimes it's just one or two things. Yeah, one or two things. Just a few brief comments. And the next day was just a unanimous vote. That's OK. One time we had a judge at a ceremony in honor of former Chief Judge Colin Seitz, who was going to give some brief remarks, a former judge, a former chancellor. And his brief remarks were 40 minutes. It was so bad that it was 35 minutes when he goes. And in conclusion, one of my colleagues visibly or audibly sighed and said, Sotovoce, thank God. I just wanted to bring to the Court's attention a few points. Number one is that we can look to the union's complaint in this case, specifically to the appendix at 830, for how the union actually views who's to decide benefit determinations. In the complaint of the union, the union pleads that, quote, benefit decisions under the terms of the plan are initially made by either Roman Haas as the plan administrator or Liberty Life as the claims administrator. However, determinations concerning eligibility for DRA, which is the other benefit, are initially made by Roman Haas. But the point is, when you have ERISA, yes, that's what happens. But then if people aren't happy, they can go to have it resolved elsewhere, another party to look at it. And then you look at what the standards review under Firestone or Post or whatever you might have. The point being that here, you are entitled to have certain things looked at. The question is, who does it? Is it an arbitrator or is it a court? And the judge here, Judge Joyner, said it's an arbitrator. And it looks like under Luke and Steele is when a judge says that a decision is being made with respect to whether an issue is arbitrable. That is something that we look at under a clearly erroneous standard. Do you agree or disagree with that first point there? I disagree. And what is the standard? The standard review is plenary. The standard review is plenary, as we've seen in all of these arbitrable cases. And how do you get around Luke and Steele? Well, I do it in two ways. Number one, I use Verizon. I use EM Diagnostic. I use other decisions of this court to address that it is a plenary standard review. That's the kind of case we have, a Verizon kind of case. Number two, the issues in this case are manageable. Is there a case where there was something specific in the sense that certain things can be arbitrated, certain things cannot be? Correct. And the issue was a question of arbitrability. That was before the court. And the court held that on these cross motions for summary judgment, that's also an important part of it, is a summary judgment analysis. Luke has had a hearing. The judge had to make findings based upon testimony that was presented. So perhaps that may have influenced a little bit. Luke says whether or not a dispute is arbitrable depends upon the intent of the parties regarding arbitration, et cetera, et cetera. Thus, we address the issue of arbitrability under a clearly erroneous standard of review. How do I get around that? Get around it through Verizon, which says that we take a look at the issue of arbitrability, which is what Verizon was. That's the most recent case from this court, 2006. It says we take a look at that issue as a plenary issue. And we also take a look at it because it is a legal question. It's a legal question as to whether or not this collective bargaining agreement provides for arbitrability. As we know from the Steelworkers Trilogy, from AT&T. I might agree with you. But the point is, Lukens is 1993. Verizon ain't. So don't we have to follow Lukens absent going in bond? How can you overrule Lukens? Well, I just think that Lukens, first of all, to the extent that it has this broad brush, and I don't believe it does because it was a hearing. It was a hearing with testimony. I'm just reporting the language to you. Whether or not a dispute is arbitrable depends upon the intent of the parties. The proper standard of view has to be whether the district court's findings, interpretation of the contract, that is the intent of the parties as to the meaning of the contract's language are clearly erroneous. Thus, we address the issue of arbitrability, and that cites Harkins. Thus, we address the issue of arbitrability under a clearly erroneous standard of view. I have sympathy with where you are, but how do I get around? Supreme Court decisions, regardless of their timing, direct us to the fact that these are questions that will have to be decided by the court. And so consequently, it falls right within the standard of review being plenary. Basically, what we have here are two important things. On the Supreme Court in terms of, I'll steer away from clearly erroneous, but the Supreme Court said in AT&T, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that in order to arbitrate, the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. We're all sitting up here with, from what you can gather, at least some doubt, at least some of us have some doubt, I do, as to what's going on here. And there's some good arguments that you have that this wasn't intended, but there also is some doubt. How do I get around the presumption that's in AT&T? Assuming that the presumption applies and we have briefed that issue, so I'll put that issue aside, is that no matter where we look in terms of the cases, there always in a case like this has to be some article that the union must look into in order to be able to support its arbitration demand. And as we saw both in terms of the briefs and as we see in terms of the article. And they looked at Article 2, Section 5, which says that working conditions includes disability benefits. That's what, in effect, that's how they're trying to bring the plan into the collective bargaining agreement. And all you really have after that is if you dispute the decision of the plan administrator or someone else who administers the plan, who decides it? Is it a court or is it an arbitrator? Under ERISA, it's a court. That's number one. I think it's very important for us to talk about the ERISA policies in this case. Number two, as cited in the cases that we present in our brief, there's also, if you want to work with So ERISA claims can never? That can be changed by contract. I'm not saying never, Your Honor, but what I am saying is that there's an important policy. What we have here, a plan with claim procedures that does final and binding authority in the plan administrator, then the important policies of ERISA for allowing for those claims procedures to be adhered to and not to be disturbed. Because essentially what the union is asking is for us to essentially ignore those and go But there's no overarching ERISA provision, is there, that says that decisions of administrators or those who make ERISA decisions can only be reviewed by court? There's nothing in ERISA that says that. Is that correct? That's in my understanding of ERISA. For example, I thought antitrust claims, for example, had to be resolved by a court. It turns out they can be arbitrated. But ERISA does mandate a claims procedure. And the general procedure that we have over many, many years, decades of law, is that we have a claims procedure when it exists. And the claims procedure doesn't have the best final binding authority in the plan administrator, but this claims procedure does. And once we have that kind of claims procedure, then ERISA tells us how claims should be handled. But if you're the union or the employees and you say, I submit that disability benefits are included within working conditions under the CBA, there is a contract interpretation issue, and I am requesting pursuant to the CBA that it be arbitrated. Number one, the union never submitted that in its grievance. Number two, working conditions are what I think was suggested by the court. They're submitting it now. It's not something that is a disability benefit. In fact, when you ask to... But that's not to be argued before us, is it? That's to be argued before the party who ultimately decides it. No, the court has to interpret the contract to determine whether arbitrability is present. And so to some extent, this is not an ERISA decision. To some extent, the court has to evaluate the contract. And if we look even at the provision that they rely upon in terms of the grievance procedure, you would ask my distinguished colleague as to whether or not overtime would be included. And he said, yes, everything is included, practically everything in working conditions, but the contract doesn't even read that. The contract distinguishes wages, individual rates, hours of employment, and working conditions. So the contract itself, in terms of its grievance procedure, doesn't talk about working conditions as being somehow all-encompassing. In fact, it doesn't obviously reference hours of employment or wages because it's distinguished in terms of the contract. Let's get one more question for him. Counsel, Article 5 isn't captioned arbitration. It's a captioned grievance procedure. It sets a six-step process in which the six step... Five and six are in one paragraph. The sixth step is arbitration, but there's one, two, three, four, five, starting with talking with your immediate boss and then working your way up, and then the fifth step is the joint labor relations committee. Were each of those steps followed in this case? Some of the steps, I think, were. I mean, did they talk to the... do you know specifically? I don't have the details, Your Honor. I don't believe that's in the record. One other point I'd like to make on the plenary versus... It wasn't covered in your brief. It's responsive to what was argued. I just would like to refer the court to E.M. Diagnostic, which predated Lugin's to the extent that the timing of the decision... Okay, so you decided to do it in your brief. Thank you very much. Very interesting and very important case. We'll take the matter into advisement. Is this a brief follow-up? Yeah, just a brief comment. Okay, well, you don't have rebuttal, though, when you're on... I just want to answer Judge O'Rourke's... Why don't you do that with a 28-J letter? Pardon me? Why don't you do that with a 28-J letter? Well, for next Tuesday, when you respond back, you can... Oh, okay. Thank you. And if you're to respond also, it'll be by next Tuesday. Your Honor, am I supposed to reply to his? If you want to, you don't have to. Okay, if you want to. But then you'll need some time after Tuesday to reply. Two days. I don't care. Two days. I'm going to say two days after that comes in. The next matter is U.S. v. Brooks. Thank you.